FILED

2022 Apr-06  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **WENDELL DWAYNE O'NEAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:20-cv-0743-LCB** |
| | ) | |
| **ALLSTATE INDEMNITY** | ) | |
| **INSURANCE COMPANY, INC.,** *et* | ) | |
| *al.*, | ) | |
| | ) | |
| **Defendants.** | | |

## <u>ORDER</u>

The Court conducted a hearing on April 4, 2022, at which Wendell Dwayne O'Neal was given the opportunity to show cause as to why he should not be held in civil contempt for his failure to comply with this Court's order of December 4, 2020. That order, among other things, imposed monetary sanctions on O'Neal in the amount of $6,500.  *See* (Doc. 105).  After the Eleventh Circuit Court of Appeals affirmed that order, this Court ordered O'Neal to comply and ordered the defendants to file status reports indicating whether he had done so.  All the defendants filed reports indicating that O'Neal did not pay any money.  (Docs. 188-124).  O'Neal appeared at the hearing as did Mark Hart, an attorney for one of the defendants.  The purpose of the hearing was to allow O'Neal to present argument as to why he should not be held in civil contempt for failing to pay the sanctions in question.  (Doc. 125).

## I. Legal Standard

"Civil contempt 'may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard.'" *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1147 (11th Cir. 2006), quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911).  In *F.T.C. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010), the Eleventh Circuit discussed civil contempt as follows:

> A finding of civil contempt must be supported by clear and convincing evidence that "the allegedly violated order was valid and lawful; ... the order was clear and unambiguous; and the ... alleged violator had the ability to comply with the order." *Riccard*[ *v. Prudential Ins. Co.,* 307 F.3d 1277, 1296 (11th Cir.2002).]  "Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance at a 'show cause' hearing." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir.1998) (internal quotation marks omitted).

## II. The Show-Cause Hearing

The Court held a hearing on April 4, 2022, at which O'Neal appeared and was given the opportunity to explain his failure to pay the sanctions.  As noted, all the defendants filed status reports indicating that O'Neal did not pay the sanctions as ordered, and O'Neal did not dispute that he failed to pay the sanctions.  And, although O'Neal appears to disagree substantively with the Court's December 4th order, there is no dispute that the order is unambiguous, clear, and valid.  It was affirmed by the Eleventh Circuit, and O'Neal did not claim that it was ambiguous or otherwise unclear.  Thus, O'Neal's only defense would be to convince this Court

that he was somehow unable, financially or otherwise, to make the required payments, i.e., that he did not have the ability to comply with the order. O'Neal was given notice that this was the focus of the show-cause hearing. S*ee* (Doc. 125 at 2).

At the hearing, O'Neal presented sworn testimony and argument asserting that he was financially unable to make the required payments.[1]  O'Neal stated that his only income is a monthly Social Security check that he receives because of a disability.  According to O'Neal, his disability status with the Social Security Administration does not allow him to work.  However, he then testified that he does work for an LLC that he created called Thirteenth Dimension, LLC.  O'Neal said he does "crisis management" for clients, which he explained consisted of legal research using the Google search engine.  When asked how much that business earned over the past 24 months, O'Neal replied, "probably nothing."  However, the Court referred him to an *in forma pauperis* affidavit that he attached to one of his earlier filings in which he stated that Thirteenth Dimension had weekly earnings of $102.45. (Doc. 16-2 at 40).  When confronted with that affidavit, O'Neal stated that he wished

---

[1] As detailed in prior orders, O'Neal submitted hundreds of pages to this Court leading up to the show-cause hearing.  However, the focus of those filings appeared to chiefly center around O'Neal's contention that the December 4th order was invalid.  However, a litigant like O'Neal is not permitted to reargue the merits of his case at a show-cause hearing such as this one.  *See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc*., 950 F.2d 1525, 1528–29 (11th Cir. 1992), quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)("It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.").

to qualify his previous response and stated that Thirteenth Dimension earns "[p]robably nothing compared to how much it spends…."  He then further qualified the response by saying that the business earned $102.45 "that week."

O'Neal then asserted that the $102.45 he was talking about did not come from a client but rather from his mother.  According to O'Neal, he lives with his mother, and she sometimes pays him to do various tasks.  When asked how much money his mother gave him, O'Neal became evasive, and the following exchange occurred:

THE COURT: And how much money do you get from your mom?

MR. O'NEAL: It depends on what she wants me to do.

THE COURT: All right. How much has your mom paid you in the last year?

MR. O'NEAL: I don't know, I would have to look at my records.

THE COURT: You can make an estimate. It doesn't have to be an exact figure, you can make an estimate.

MR. O'NEAL: Not much.

THE COURT: What's your best estimate?

MR. O'NEAL: What it is that I put in my affidavit.

THE COURT: Which is what? Mr. O'Neal, I'm not playing a game with you, okay? So you just need to answer my questions.

MR. O'NEAL: How much has she paid me within what time period?

THE COURT: Within the last year.

4

MR. O'NEAL: Your Honor, I can honestly say that I don't know. I don't know. Because what she gives me for helping her, I don't know if she even considers it to be payment.

THE COURT: It doesn't matter what she considers it to be. How much has she given you in the last three months?

MR. O'NEAL: In the last three months, she's probably given me in the last three months, probably about 400 and something.

THE COURT: Is that typical as to what she would give you every two or three months?

MR. O'NEAL: No.

THE COURT: Would it be more or less?

MR. O'NEAL: Less. In fact. She stopped giving me anything.

O'Neal was next questioned about the disposition of the $75,000 he received in settlement proceeds from the underlying state court proceedings.  O'Neal claimed that he no longer had any of that money because he gave some of it away to his mother and other  unnamed individuals; used approximately $5,000 of it to buy office supplies; and used the remainder to purchase a sports car that he later traded in at a loss for a new 2020 BMW X3 that he is currently driving.  O'Neal told the Court that he also put an additional $15,000 down on the BMW and financed the rest.  O'Neal estimated that the BMW was currently worth $38,000.

However, given O'Neal's evasive and inconsistent testimony, the Court was not persuaded that his resources were as limited as he suggested.  Under oath, O'Neal admitted that he was a smoker and that he spends "eleven or twelve dollars" on two

packs of cigarettes every three to four days.  He also admitted that, since the beginning of 2022, he has spent over $500 in postage relating to both the numerous and often vexatious filings in this case and other matters.  According to O'Neal, this amount of postage was typical of his quarterly expenditures.  Thus, despite his allegations that he was financially unable to pay the sanctions, O'Neal admitted to spending approximately $80 per month on cigarettes and $500 every three months on postage.  These expenditures demonstrate that, despite his allegation of poverty, O'Neal has disposable income that he chooses to spend on optional and/or luxury items for himself rather than pay the court-ordered sanctions.

The Court also notes that it did not find O'Neal to be a credible witness.  On multiple occasions, the Court had to ask the same question several times because O'Neal would give evasive or incomplete answers.  Further, O'Neal's tone, pace, demeanor, and body language caused the Court to find that he was not being entirely truthful.  Thus, the Court does not believe that O'Neal's resources are as limited as he suggests and does not find him to be a credible witness.  At the very least, O'Neal has the money to spend a few hundred dollars per month on luxuries for himself.

O'Neal has known about these sanctions since this Court entered its order on December 4, 2020.  Further, he has known that his appeal was unsuccessful since the Eleventh Circuit released its opinion affirming this Court's order on October 19, 2021.  *See* (Doc. 114-1).  In sum, O'Neal has known that these sanctions were

6

forthcoming for quite some time yet failed to make arrangements to make any payments whatsoever.

Based on the foregoing, the Court finds by clear and convincing evidence that O'Neal had the ability to pay the sanctions but failed or refused to do so. Accordingly, and based on the foregoing, the Court held O'Neal in civil contempt of its December 4, 2020 order. After making that finding in open court, the undersigned ordered that O'Neal be taken into custody by the United States Marshals Service until such time as he purged himself of his contempt by making a $500 payment toward the balance of his sanctions. The Court found this necessary to coerce O'Neal into compliance with its orders.

Although the Court did not consider the following regarding whether O'Neal should be found in contempt, it would note that O'Neal informed the Marshals that he had $400 cash in his vehicle while being taken into custody, and he immediately paid the $500.[2] He was then released from custody.

## III.    Right to Counsel

Finally, the Court notes that O'Neal made a request for appointment of counsel at the beginning of the hearing. O'Neal stated that he believed the hearing was criminal in nature, and therefore requested that the Court appoint an attorney to

---

[2] O'Neal later admitted under oath that he had at least $400 in cash.

represent him.  However, the Court informed O'Neal that the show-cause hearing was for civil contempt and did not appoint counsel.

The United States Supreme Court addressed the issue of the right to counsel in the civil contempt context in *Turner v. Rogers*, 564 U.S. 431 (2011).  In that case, the Supreme Court reviewed a ruling of a South Carolina state court that found a defendant to be in civil contempt after he failed to make child support payments as ordered.  The Court held:

> We here consider an indigent's right to paid counsel at such a contempt proceeding. It is a civil proceeding. And we consequently determine the "specific dictates of due process" by examining the "distinct factors" that this Court has previously found useful in deciding what specific safeguards the Constitution's Due Process Clause requires in order to make a civil proceeding fundamentally fair. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (considering fairness of an administrative proceeding). As relevant here those factors include (1) the nature of "the private interest that will be affected," (2) the comparative "risk" of an "erroneous deprivation" of that interest with and without "additional or substitute procedural safeguards," and (3) the nature and magnitude of any countervailing interest in not providing "additional or substitute procedural requirement[s]."

*Id.* at 444-45.

In that particular case, the Supreme Court found that the first factor weighed in favor of appointing counsel because the interest at stake was the defendant's personal liberty.  However, the Court noted that "the Due Process Clause does not always require the provision of counsel in civil proceedings where incarceration is threatened.  And in determining whether the Clause requires a right to counsel here,

8

we must take account of opposing interests, as well as consider the probable value of 'additional or substitute procedural safeguards.'" *Id.* at 446, quoting *Mathews*, *supra*, at 335.  Those procedural safeguards include "(1) notice to the defendant that his 'ability to pay' is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay." *Id.* at 447-48.

In the present case, the Court gave O'Neal ample notice that his ability to pay was the focus of the show-cause hearing.  O'Neal even stated on the record that he understood that to be the focus of the hearing.  The Court then gave O'Neal the opportunity to respond to questions regarding his income, and, afterwards, found that he had "the ability to pay some of [the sanctions] if not all of them."  Thus, O'Neal was afforded all the procedural safeguards the Supreme Court laid out in *Turner*, and, consequently, did not grant O'Neal's oral request for the appointment of counsel.

While the present case does not involve child support payments, the Court finds those types of cases to be instructive regarding a party's choice to spend money on optional purchases instead of paying court ordered amounts.  The purpose of the Court's line of questioning regarding O'Neal's monthly expenditures for cigarettes

and postage was to determine what kind of disposable income he actually had, notwithstanding his testimony. As noted, O'Neal admitted to spending approximately $80 per month on cigarettes and $500 every three months on postage. Thus, O'Neal had at least that amount in disposable income.

## IV.    Further Proceedings

The Court notes that one of the defense attorneys appeared at the hearing and detailed his experiences with O'Neal between the show-cause hearing and the Court's December 4, 2020 order. According to defense counsel, O'Neal continued to send hundreds if not thousands of pages of correspondence regarding his attempts to have the merits of the case invalidated by filing various requests with other courts and governmental agencies. As noted on the record, the stack of correspondence that defense counsel produced stood well over a foot high. While this filing behavior may also qualify as either civil or criminal contempt, the Court did not consider it when holding O'Neal in contempt on April 4, 2022. This order is based only on O'Neal's failure to pay the monetary sanctions. The Court will schedule further proceedings to address O'Neal's other alleged infractions at a later date.

## V. Conclusion

Based on the foregoing, the Court hereby finds by clear and convincing evidence as follows:

- The order of December 4, 2020, is valid, clear, and unambiguous;

- O'Neal failed to comply with the order when he failed to pay the sanctions;

- O'Neal was given notice and an opportunity to be heard as to why he should not be held in contempt;

- O'Neal is not a credible witness; and

- O'Neal had the ability to pay the sanctions.

Accordingly, it is hereby **ORDERED** as follows: **Wendell Dwayne O'Neal is found to be in civil contempt for failure to pay $6,500.00 in previously ordered sanctions. He is ordered to the custody of the United States Marshal unless and until he purges himself of his contempt by paying $500.00 and paying the remaining $6,000.00 in installments of $250.00[3] every 60 days until the balance is satisfied. The first of these payments is due on June 6, 2022, and subsequent payments are due every 60 days thereafter. If the due date falls on a weekend or federal holiday, the payment will be due on the next day that the Court is open for business. The Court notes that O'Neal paid the $500.00 on the date of the hearing and was released from custody.** O'Neal shall pay the sanctions into the registry of the Court to be distributed to the defendants once paid in full. **<u>Again, the Court warns O'Neal that failure to follow this order may necessitate further</u>**

---

[3] The Court arrived at this figure by adding together the amounts of money that O'Neal admitted to spending on cigarettes and postage on a monthly basis.

**contempt proceedings and could result in further sanctions and/or imprisonment.**

Finally, while the Court believes that O'Neal has the ability to pay these sanctions immediately and in full, out of an abundance of caution it has allowed O'Neal to make these payments in installments. However, O'Neal may pay the sanctions in full at any time should he so desire.

**DONE** and **ORDERED** April 6, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE